I please the court. My name is Deirdre Mocas and I represent Vicente Ruiz-Gaxiola. Simply put, the government wants to forcibly give Mr. Ruiz this drug, but it has not proven the factors that it must prove to forcibly medicate Mr. Ruiz. And Mr. Ruiz does not have... Is this the court held otherwise? That is correct, your honor. And we review the NOVA on issue number one, the government's need, and everything else we review for substantial evidence, right? Your honor, I believe it's reviewed for clear error, and I believe that there was clear error in this case. Clear error I think means the same thing as substantial evidence, isn't it? Or are we talking different languages? These are factual findings. Yes, your honor. And the question is whether they are supported by the record. Yes, your honor. Well, the finding that we're reviewing is whether the government proved each of the four elements separately by clear and convincing evidence. Yes, your honor. So, you know, these games we play with these standards, we have to find, as Judge Kuczynski would say, substantial evidence. What? The finding that it was clear and convincing evidence that the government proved it by. That there's no substantial evidence that they proved it by clear and convincing evidence. Now, if you can figure out how you do that, congratulations. I'm not going to congratulate yourself quite yet. Have we held this as by clear and convincing evidence? Your honor, I do not. I didn't think we had. I believe you are correct. I don't believe the United Circuit Court of Appeals has held that it's by clear and convincing evidence. However, the sisters. Well, the Selle case is clear and convincing. The Selle case certainly implies that it's clear and convincing. And the Second Circuit in Gomez, the Tenth Circuit in Bradley, and the Sixth Circuit in Brandon all find that it is clear and convincing. So I would urge this Court to do so as well. Well, we certainly would want clear decisions. Certainly not with the Sixth Circuit. But Rivera-Guerrero doesn't say so, which is our case applying, right? Right. I believe that it was not delineated in Rivera-Guerrero. Okay. All right. So what is your argument? Which of these findings do you think is not supported by that? Well, I believe. Why don't you start with the weakest one, the one that you think is the most vulnerable? I think they haven't proven any of them. And you don't think the government's compelling need was proven? Well, when we talk about the serious crime, and it's a compelling need. I mean, that's the first factor. It is a serious crime. We held that in. In Nanda's last case. Right. And they can't seem to, you can't bring him to trial in his current condition, right? That is correct. Well, why don't you start with either two or four, since you've only got six minutes in the official talk? Yes. Thank you. First off, I would note that the government did not prove that it is substantially likely to render Ruiz competent to stand trial. And I note that Dr. Cheltenham, the government's expert, explained that his experience is relatively small with delusional disorder, that he treated two people in Pennsylvania who voluntarily took medication in an outpatient clinic in Pennsylvania. So very different from this case. He did explain that he had probably. I'm sorry. Why is that different? If the drug has that effect, it shouldn't make any difference if it's administered voluntarily or not. If it works, it works. And if it doesn't work, it doesn't work. Right? No, Your Honor. As Dr. Cloninger explained, that does go to the heart of the matter because it, the feelings of inferiority and the hypersensitivity to powerlessness are part of what drives delusional disorder. And so if you have someone who's being involuntarily medicated, that is only reinforcing the hypersensitivity to powerlessness and those feelings of inferiority. Dr. Cheltenham did explain that he's had probably four patients at the Bureau of Prisons who have had delusional disorder, but that none of them have gone to cell hearings and none have been forcibly medicated. So he actually had not treated anyone with antipsychotics. But didn't he rely on the study done by his colleague, right? Mr. F.M.C. Butler? Yes. That is what he relied upon. He relied upon what is not a study, but it is a retrospective review. It is going and pulling the files and saying, well, what do we think happened here and what, you know, seems to make sense out of this. It's not a study that is controlled from the beginning so that they can set up control people and they can set up people on the medication and they can actually prove a cause and effect because they can control other variables. This is going back and kind of, well, maybe this is what happened, looking at it and trying to fit it together. And in that retrospective review, the reviewers actually stated that this is something that could have included people who are misdiagnosed, people who are wrongly diagnosed, included some where they shouldn't have been included, excluded others where they shouldn't have been excluded. And they admit that it's biased and potentially biased in favor to what they were trying to find. And also when we look at who took supposedly the medication that they would like to give, there's an extremely small sample size in that retrospective review. There were only 22, but just 12 took this involuntary Haldol if everything is correct. And another thing I'd like to bring up is the fact that there really is no mechanism for making sure that he is competent at trial. It's one thing to say, assuming they're able to restore him to North Carolina, usually the marshals with the airlift bring him to Oklahoma and then would make his way back to Arizona. The problem with that is we find that people decompensate because they don't get the medication. It could be six weeks. And even assuming that he is competent when he arrives back in Arizona, there's still the possibility during negotiation, investigation, preparation, that he's going to decompensate then. And there is no mechanism to make sure that he would get any sort of medication in Arizona. And as they note in the retrospective review, the medical staff at the facilities... You mean you're complaining that they didn't order enough medication? I mean, you can always go back and say he's about to run out of the regimen. The trial isn't for a while. We'd like to have it continued. Just the court could do that, right? It's not like they would let it sort of go off the edge and they say, okay, if the thing is working and he is now a lot better and they're transporting him back, and all of a sudden they run out of authorization to give him more medicine, they could go back and get more authorization, right? Well, this was something that the government was supposed to show at the hearing and did not. And who is going to give him this medication at the jails where the people are housed in Arizona? They don't do it. They don't forcibly medicate people. And this is noted in the retrospective review by Dr. Herbold where he says these facilities typically do not provide involuntary medication so that people have to be willing to take it voluntarily. And so then we get back to square one. If the court issues an order that he should be involuntarily medicated in certain doses over a period of time, that's directed to the distilling offices, right? And they're obligated to follow the court order, right? As he leaves Butler and goes to Arizona, they're supposed to give him his regimen. The marshals, I assume. Well, Your Honor, if he doesn't take it involuntarily, I mean if he doesn't take it voluntarily, there is no one to give it to him voluntarily. Well, he's not going to take it voluntarily. That's his problem, one of his problems. Yes, Your Honor. With involuntary medication, the whole issue with marshals is moot because distilling offices, hospital people aren't going to comply with the court order. There's no one to give it to him. They just don't do it involuntarily. Is that on the record? No, Your Honor, but that was the government's burden to prove that he would be competent. And in Dr. Herbold's study or retrospective review, it says that they typically do not involuntarily medicate. So it is in the record in that the government submitted this retrospective review that says they don't involuntarily medicate. Okay, thank you. We'll hear from the government. Good afternoon. I'm Mike Schmidt on behalf of the United States. We're here today to determine whether or not the cell order in this case was appropriate. As you all know, there are four factors in deciding whether or not a cell has been met. Government interest is probably the least important today, and the others deal with the medication. Those are factual findings and reviewed by clear error. Elements number two and four, I think I heard the court posit, were of most concern. And those deal with whether or not the medication would substantially assist the defendant in making him competent. And part two of that second factor is whether or not he's substantially likely to render him competent. Correct. And part two of that factor is whether the side effects would be most minimized. Factor four is the medication regimen and whether or not it's appropriate for that person individually, that defendant. In other words, does he present with other illnesses that might conflict with the medication? I would submit that on number four, that would be of our least concern. As we learned from Hernandez-Vazquez and guidance from other circuits, you have to have a protocol. And that was achieved in this case. It almost embodied every single circuit case from the last three years in being so precise in its protocols. Specifying the medication, the quantity, the duration, and more than any other circuit decision, also mandating that there be reports every 15 days to the judge accounting for the status of the symptoms, the status of the medication, whether or not there's any decreases necessary or cessation even, and whether or not a conversion to a second generation atypical evidence. I was a little confused by that. Does the order authorize conversion to another medication? It doesn't explicitly in its final, I believe the last two pages where the protocol is written out. But within the R&R, the report and recommendation, as well as throughout the sale hearing itself, the record is replete with references to conversion to second generation if it's appropriate. And I think that's also embodied in the first two paragraphs where it talks about updating the court and whether or not he is capable or amenable to taking oral medications. The second generations, the atypicals, are orally delivered voluntarily. Are you talking about cogenic to minimize the effect of the halopone? No, Your Honor. That's a side effect medication typically given for the first generations, typical antipsychotics. This would be basically you stop the Hal-Doll and you switched him to something else. Precisely. The second generation drug. The atypical antipsychotics, yes, Your Honor. It seemed a little odd to me that he says report to me if you do this when the order itself doesn't really say you're authorized to do this and here are the circumstances under which you're authorized to switch drugs. Here's how that can be reconciled. I understand what Your Honor is talking about. The forcible medication is relevant when there's resistance. That resistance is a product of his delusion that he doesn't need help, doesn't have an illness, and has historically for 30 or more years refused to recognize an illness, let alone treatment. The Hal-Doll, the first generation approach, would ideally dissolve chemically that wall that creates the perception that he's being persecuted and he has this motivation from God that he has to come back and recommit these kinds of offenses. When that wall is dissolved by Hal-Doll, the first generation typical antipsychotic, the theory flows that he's no longer A, incompetent, and B, resistant. So when he transfers to the second generation, he's taking it voluntarily. The issue about cell is no longer appropriate because now he's amenable, through the magic of the antipsychotics, to recognizing he has an illness and agreeing to voluntarily take the second generation. So what I would submit to you is one... take Hal-Doll under these circumstances. And after that, he's going to say, please give me some of that wonderful medication, but give me the next generation. Yes. Because I don't care about my orders from God anymore. I think, or hope, and I believe that that is exactly what would happen. And that's why it doesn't have to be memorialized, per se, in the order, notwithstanding the fact that it's throughout the record and the R&R. So what you're really saying is that the second generation is going to make him fit for trial, or the first generation and the second? Well, the testimony and the study support that either one will. The major difference between the first and second generations, the typicals and the atypicals, is the quantity or degree of potential risk for side effects, the ESPs, extraperimental side effects, the dyskinesias in particular. And the second generations have a much less record. But he's not willing to take the second generation until you cure him with the first generation. And the reason is that the second generations are orally administered, and it's much more aggressive, violent, invasive to force someone to orally take medication, which is why all of these protocols, the five other circuits that have ruled in favor of involuntary medication, this medical intervention, have predominantly elected to do first with Hal-Doll because there isn't a long-term injectable version of that typical antipsychotic. There isn't that available for the second generations. I don't see what in the record shows by clear and convincing evidence that Hal-Doll solves this problem. The first effort that was made was by Dr. Cheltenham, is that it? Yes, Your Honor. Who first said that we have reports for hooks that show that. And then he said, no, that was wrong. That's for, was it schizophrenia or, yeah. So that didn't work. So then he said, well, we do have these people at FMC Butner, I guess. And we had 22 people and 12 of them had Hal-Doll and it worked with them. And is that the evidence? That's part of the evidence. There's more reference in the record both in terms of the testimony by the government doctors at the South hearing but also in their sealed reports, also part of the record, where they refer to other studies. Now, one thing that we have to keep in mind about delusional disorder is, A, it's still an evolving diagnosis. It's only recently recognized. And, B, there are no studies of the kind that the defendant refers to, which is a double-blind, randomized, full-blown class A study. There are none in existence anywhere. So what you have to rely on, and everybody, whether you're a plaintiff or a respondent, is retrospective reviews. And the difficulty is that with delusional disorder, it's a representation in the population of barely three per 10,000. And the other unique thing about delusional disorder, unlike the other psychotic disorders, is that most of them are functioning. What's interesting is that the ones that function the least best are probably the ones self-selected for the prison population, the ones that we're most interested in, and therefore I would submit the ones most likely in need of the involuntary medication for their own benefit. So you have a disorder that doesn't lend itself to studies as traditionally defined. Well, it's a 77% success record. I think the doctor testified to that. In Dr. Herbal's study that our doctors referred to, that's correct. And there are similar studies referenced throughout the record that have it between 70% and 90% success rate. And, of course, success rate is defined as competent, not necessarily cured. There's a big difference. And on the other side, you have a doctor who had... Your doctor had been practicing psychiatry about 17 months at the prison and four months somewhere else. The one doctor, Dr. Tellingham, yes, and the other doctor, Dr. Pine, had been practicing for about 21 years. He was a psychologist. Psychologist. Correct. Still a Ph.D. Well, he wasn't a doctor. Fair enough. He wasn't a medical doctor. Absolutely. And Dr. Cronin, who had been a psychiatrist for 30 years, published 350 articles in books and edited psychiatric journals. Here's the thing. He has a very lengthy resume, but I would submit to you a rogue opinion in this case for two reasons. Number one, this is very important. 30 years doing something the same. Not that, Your Honor. No, that was not one of my two. The first is that his approach that he defended in the original cell case was a well-being approach, and he very explicitly chose not to endorse that in this case and admitted that it's not recognized clinically. What's important about that? Well, there's a lot of things that aren't recognized by the FDA that are still clinically appropriate. In fact, 85% of antipsychotics are administered off-label. They're designed for schizophrenics, but they're not designed, for example, for ADHD. And over a million people are prescribed that, children, in fact, when it's not per the FDA, it's not on-label. So, importantly, Dr. Cloninger's own well-being approach, A, wasn't endorsed here, and B, is not recognized clinically. Secondly, we have... Your Honor, I see my time is almost up. Go ahead. Thank you. Secondly, we have the American Psychiatric Association submitting an amicus brief in the U.S. Supreme Court cell case. And what's interesting about that is this. The American Psychiatric Association represents about 38,000 psychiatrists. There are only about 42,000 in the country. But a very huge percentage belong to this organization. And the brief in the cell case was in favor of medication, in favor of giving antipsychotics to Dr. Sell, the defendant in that case, who had delusional disorder, this rare, seldomly studied illness, which is exactly the situation with Mr. Ruiz. It wasn't Haldol in the cell. I don't recall the antipsychotic applied. Is it correct there's an 8% chance of tardive dyskinesia? It's a mouthful. It's tardive dyskinesia. There's... By Dr. Cloninger's estimation, it's about 8% within a year's time, 5% within 3 to 6 months' time. Our doctors are very close to that. The FMC government doctors indicate roughly 5% within 6 months' time. That's not of any moment here because the regimen would be for less than 4 months. And, again, ideally, within 30 days, within that first intramuscular dosage, those walls would become dissolved, and he would be on the second generations, taking it orally, voluntarily, on a daily minimal dose. What happens if after a month or so he doesn't want to take it from a daily... voluntarily? The protocol would be the intramuscular injections every 4 weeks for up to 4 months, with, again, reports every 15 days about the status of that. And how is that somehow... You said the fourth point was not of any concern. How is that medically appropriate in his best interests? To take that risk so that he would have the privilege of testifying. And I didn't mean to discount it in its importance, just in relation to what I think we all recognize as number 2 being very, very important. But, look, in this case, you have a defendant who, for 30 years, has been enmeshed in the criminal justice system, who has 33 arrests, 20 convictions. This is why we're not even... Mainly that he wants to come to the United States. That's not so crazy. The 13 deportations do represent that. But the fact that he has 33 arrests, the average American doesn't present that. And so there's an interest here in not having him here being a predator. No, no, but I'm talking about number 4. What kind of a predator is he? Well, whether you're delivering drugs, as about 5 of his felony convictions represent, or property crimes, or the occasional, relatively minor violent crime, but nonetheless assaultive behavior, these are all preying on society, I would submit. But how does it relate to number 4? It's this. There's a relationship between his legacy of being delusional and his criminal history. They're both about 30 years long. And I would submit to you that intertwining is not unconnected. I thought there was no evidence of his being delusional until he found the sandwiches or the burritos in the desert. That was in 80 or 81. Right. So it was about 25. Oh, I thought that was recently when he found the burritos. There's a point in the record, Judge, where Dr. Cloninger says he thought it was in 2000. He looks at his notes and then realizes, no, it was in 1980 or 81. So you're right. But the record does support it. It was in about 28 years. So if he's medicated and it works, he then goes to trial and then he gets acquitted or convicted or whatever, and there's one court. What happens if he doesn't get medicated? Or what happens if the medication is administered and it turns out it doesn't really work? If it doesn't work, the only other choice is to dismiss the case and re-deport him. And what? And re-deport him because he doesn't have lawful status. And as we see, notwithstanding 13 deportations and getting five years for his last one, he came back one month later and was arrested 11 months after that. So he did good work. When God tells you to do it, you obey. Right. You obey and do it. And what if we're not lawful and we don't allow the administering of the medication? What happens then? The same thing? He gets dismissed and he gets deported again? Or is he held further? I'm just wondering. If this court finds that the cell order was not specific enough, missing one of those four components, I would gather that you would be specific in your finding of where that shortcoming existed, and hopefully there would be an opportunity on remand to remedy that. For example, the protocol wasn't specific enough, although I think I would submit that that has been achieved here. Again, lessons learned from Hernandez, Vasquez, and Curtis. But if the court, for example, found that Category 1 wasn't met, the seriousness of the history of the crime, I don't know that we could present anything further, because that's a legal finding that you reviewed in Oval. But if somebody's held not competent to stand trial, then you have to release him? Correct. Well, no, not immediately. You're taking him for civil proceedings, aren't you? Except there wouldn't be a civil proceeding available in this case, because he was found, under the Harper analysis a year ago, to be not a danger to self or others. That's really the only mechanism to civilly commit him to the criminal justice process. And that's precisely why SEL and this court has previously held, do the Harper finding first, because that is so much easier to resolve involuntary medication with, danger to self or others. So all the protocols now accomplish that and do that, and in this case he was not found under Harper to be a danger to self or others. So we can only do the nonviolent commitment, and that is finding this interest, government interest, and maximizing, minimizing the balance of medicine. So where I'm going with the fourth factor, and, Your Honor, why it matters, is that this relationship has to be connected. The medication, if it causes this wall to dissolve so he stops hearing these commands from God and he stops feeling like he's persecuted at the slightest show of authority, maybe then he'll be free for the first time. And he won't come back, and he'll stay on his medication. But he's quite happy now, isn't he? I don't know. I don't know if he knows what happiness is if he spent 30 years in the criminal justice system. I don't know that he would know whether or not he's happy or not. Well, if you don't know and you think you are, that's pretty good. Don Stewart, no. You're right. Okay. Thank you. Thank you. Well, I think you're out of time. Would you like to take another photo bottle? Yes, I would, Your Honor. I want to ask you first, do you agree that if we find that they were to reverse the cell order, then he would be turned loose? I agree, Your Honor, that he would be deported to Mexico. He was found to be non-dangerous at the heart for hearing. Thank you. And I would just like to address the medical interest. It is not in his best medical interest. It is not medically appropriate to give him this medication. What they're talking about doing is shooting this into him for two to four months on the hope that it will make him competent for trial. It has no ñ there was never even any discussion of long-term benefit to him, that all of a sudden he gets this medication, he does his time, he goes back to Mexico. And he stays competent. He's not delusional. There's just nothing to suggest that. He, like most people, worries about side effects of medication. And he has seen these side effects of medication. When he was at Butner, he saw people with the effects of the tardive dyskinesia. And he explained that, what they're doing, and he demonstrated what they're doing. Like most people, he doesn't want to behave like that. He has this delusion. He thinks he has a right to be here. He thinks he's going to get some sort of reparations. But aside from that, he's very high-functioning. He does well in other areas. It's just that his delusion goes to the heart of what he's charged with. So in summary, I would ask the Court to not medicate him with this. It is very powerful medication. He is otherwise high-functioning. The government has not shown what it needs to show in order to medicate him. It is unfortunate that there is a lack of understanding about how exactly this and many other psychiatric illnesses can be treated. But that doesn't mean that he should be experimented on. And that's essentially what this would be, because there is nothing to say that it's going to work, that it's not going to have the side effects, or that it meets any of the criteria of stealth. And the government did not show that, those factors, by clear and convincing evidence in this case. I do not, Dr. Klein, express the opinion. Please tell me, because I may have forgotten the record. But do you not express the opinion that tardive dyskinesia is a permanent side effect, and even if your client was brought into confidence, he could still suffer that side effect? Yes, because he cited a study that showed, and I think it was from the British Journal of Medicine, that, yes, that 8% in the first year, and that it's cumulative, 16% in the second year, 24% in the third year, and that this is something that does not go away. It stays with him. And then when he's done with his time, and I will note that he has been incarcerated now for 38-plus months. And if he is given this medication and he does suffer these side effects, he's turned back to Mexico. He's likely not going to have the treatment that he needs to deal with the side effects. Okay. Thank you. Thank you. Okay. Just five minutes.
judges: Kozinski, Reinhardt, Timlin